Levine, J.
(dissenting). I respectfully dissent. I disagree with the majority’s proposition that all questions in this case regarding “what the Legislature allowed or prohibited under the Security Fund scheme [are] matters substantive and preserved for independent judicial assessment” (majority opn, at 115 [emphasis supplied]). The Superintendent of Insurance has the central role in the administration of both the liquidation of an insolvent insurer and of the New York Property/Casualty Insurance Security Fund. The procedures for liquidating the insolvent insurer’s estate and for claims against the Security Fund are complementary, and part of an intricate interlocking statutory framework for administration of liquidations, payments out of the Security Fund and subrogation rights of the Security Fund in liquidation proceedings. The Superintendent has fiscal and fiduciary responsibility regarding preservation of the adequacy of the Security Fund for creditors of all insolvent State insurers and of liquidated insolvent insurer estates, and fair treatment of all such creditors in both kinds of proceedings. For these reasons, we should defer to the Superintendent, who is charged with the responsibility of implementing these complex provisions of the Insurance Law (see, Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs. — Superintendent of Ins.], 60 NY2d 1, 8; Ostrer v Schenck, 41 NY2d 782, 786).
L
“The Superintendent of Insurance is vested with broad power to interpret, clarify, and implement the legislative policy” of the Insurance Law (Breen v Cunard Lines S. S. Co., 33 NY2d *130 508, 511). The Legislature has expressly bestowed such interpretive authority on the Superintendent with respect to the Insurance Law in general (see, Insurance Law §§ 201, 301), and specifically reiterated the Superintendent’s power to “adopt, amend and enforce all reasonable rules and regulations necessary for the proper administration of the funds” in article 76 (see, Insurance Law § 7613).
Not surprisingly, given the expansive legislative delegation of power to the Superintendent, this Court has repeatedly recognized that the Superintendent’s interpretation of the Insurance Law is entitled to deference where not irrational (see, Paramount Communications v Gibraltar Cas. Co., 90 NY2d 507, 513-514, rearg denied 90 NY2d 1008; Matter of John Paterno, Inc. v Curiale, 88 NY2d 328, 333-334; Matter of American Tr. Ins. Co. v Abdelghany, 80 NY2d 162, 167; Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 NY2d 444, 448; Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs. — Superintendent of Ins.], supra, 60 NY2d, at 7-8; Ostrer v Schenck, supra, 41 NY2d, at 785-786; Breen v Cunard Lines S. S. Co., supra). We have declined to accord weight to the Superintendent’s interpretation of the Insurance Law only where the interpretation “runs counter to the clear wording of a statutory provision” (see, Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., supra, 66 NY2d, at 448; Paramount Communications v Gibraltar Cas. Co., supra, at 514), and, on only one prior occasion, where we deemed the question before us to be one of “pure” statutory construction and therefore unneedful of any special competence or expertise that the Superintendent might provide (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459).
Significantly, until today, whenever this Court has been called upon to interpret the statutory provisions governing the Security Fund, we have never annulled a reasonable statutory construction by the Superintendent (see, Paramount Communications v Gibraltar Cas. Co., supra; Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs. — Superintendent of Ins.], supra, 60 NY2d, at 7-8). The statutory provisions at issue here are no less ambiguous or complicated than that encountered in Arcade, where we construed the predecessor to one of the statutes applicable here — Insurance Law § 7603. Thus, we should be just as reluctant to reject the Superintendent’s judgment in the matter before us as we were in Arcade.
Moreover, I do not draw the same implication as the majority that our affirmance of the Supreme Court in Matter of Royal *131 Bank & Trust Co. v Superintendent of Ins. (148 Misc 2d 863, affd for reasons stated sub nom. Matter of Union Indem. Ins. Co., 179 AD2d 374, affd for reasons stated at Sup Ct 80 NY2d 983) is a precedent for rejection of deference to the Superintendent in the instant case (see, majority opn, at 123, 124). That decision, adopted by this Court, expressly applied the deference standard (see, 148 Misc 2d, at 866) but found that the Superintendent had taken conflicting positions and therefore his interpretation was unreasonable and not entitled to deference under Matter of Field Delivery Serv. (Roberts) (66 NY2d 516) (see, 148 Misc 2d, at 868).* Therefore, our precedent at the prior stage of this proceeding only solidifies my conclusion that the Superintendent’s interpretation should be upheld if reasonable.
Here, the postliquidation interest issue requires us to grapple with the intricate interplay between the Security Fund and an insolvent’s liquidated estate. The Superintendent, as the legislatively designated Liquidator of the insolvent insurer’s estate (see, Insurance Law § 7405 [a]) and as the administrator of the Security Fund (see, Insurance Law § 7601 [e]), is in the best position to fully appreciate the practical consequences and foreseeable legal effects on his duties resulting from the interaction between the two statutory schemes (see, majority opn, at 117 [acknowledging complexity of the pertinent statutory framework]). Deference in this circumstance will yield a more coherent, consistent body of statutory interpretation and will avoid the complications and unworkable or inequitable consequences which may ensue by permitting the courts of this State to make their own policy-based independent interpretations of these statutes.
As to the second issue — the meaning of “limit of liability” in section 7608 (c) — the majority opinion demonstrates that the resolution of this question necessarily generates further questions about the nature of the bonds secured, the policy behind the statute and the convoluted history and development of both the statute and the funds it addresses (see, majority opn, at 122-123). Where, as here, the statute is ambiguous and calls into play considerations that fall within the Superintendent’s field of expertise, it is proper to assign weight to the Superintendent’s construction (see, Paramount Communications v Gibraltar Cas. Co., supra, 90 NY2d, at 513-514).
*132 IL
The Superintendent denied plaintiff-respondent Royal Bank and Trust Company recovery from the Security Fund of postliquidation interest amounting to $6,632,450.29 (as of September 19, 1997) on its claims because such interest would be expressly disallowed were Royal attempting to recover the claim directly from the liquidated estate of its insolvent insurer. Even were deference to this decision not appropriate, it is evident that the Superintendent’s interpretation is more consistent with the statutory language and our precedents than the rule adopted by the majority today and, thus, should prevail.
The Superintendent correctly points out that the Security Fund “shall be used in the payment of allowed claims” (Insurance Law § 7603 [a] [1] [emphasis supplied]) and that an “allowed claim” is “a claim which has been allowed by the court in a proceeding under article seventy-four of this chapter” (Insurance Law § 7602 [g] [emphasis supplied]). The procedures for taking advantage of the protections afforded by the Security Fund require the creditor first to bring the claim in the liquidation proceeding, and have it recognized by the Court supervising the liquidation, before seeking payment from the Security Fund (id.). Thus, the Superintendent argues, it logically follows that recovery which would not be “allowed” under article 74 should not be “allowed” from the Security Fund. As there is no dispute that article 74 expressly prohibits the collection of postliquidation interest from an insolvent’s liquidated estate (see, Insurance Law § 7434 [b]), the Superintendent’s construction is rational and consistent with the language of the applicable statutes.
The majority nevertheless rejects this construction, principally because Insurance Law § 7434 (b) solely refers to interest on “dividends,” which, by definition, are distributions from the liquidated estate, and not, the majority argues, intended to correlate to “payments” out of the Security Fund (see, majority opn, at 116-117). To support its hypothesis, the majority points out that the word “payment” is used consistently throughout article 76, while the word dividend is used to refer to distributions from the liquidated estate in article 74 (id.). Thus, according to the majority, the restriction against postliquidation interest on dividends in section 7434 (b) cannot be read to apply to payments out of the Security Fund under article 76.
Concededly, the word “dividend” is used as a term of art to describe payments made to creditors out of a liquidated estate *133 (see, Black’s Law Dictionary 931 [6th ed 1990]). Indeed, under article 74, all distributions on allowed claims against the liquidated estate are “dividends” because, by definition, they are payments made out of the liquidated estate. By concluding, therefore, that the prohibition against allowing a claim for postliquidation interest on a dividend under section 7434 (b) does not also translate into a prohibition against collecting a payment for that same claim from the Security Fund, the majority creates confusion over the reach of the article 74 allowed claim restriction on Security Fund payments under section 7602 (g). As the term “dividend” is used frequently in the provisions of article 74, which governs distributions out of a liquidated estate, it will be difficult to determine, under the majority’s linguistic distinction between dividends and payments, whether such provisions also would be read out of the allowed claim restriction on Security Fund payments in section 7602 (g). Undoubtedly, the majority holding will have a substantial limiting impact on the scope of the allowed claim restriction and the screening process contemplated under article 76, whereby claims are submitted to the Liquidator in the first instance for “allowance.”
The majority also accepts Royal’s argument that, because section 7434 refers to both “payments and dividends” in subdivision (a), but only “dividends” in subdivision (b), the Legislature must have intended that the limitation on postliquidation interest in subdivision (b) does not apply to “payments” made by the Security Fund. Reliance on the inclusion of the word “payment” in subdivision (a) of section 7434, and absence of that term in subdivision (b) in connection with the prohibition against interest on dividends can only be of significance if the word “payments” in subdivision (a) was intended to mean distributions from the Security Fund. As the majority points out, the predecessor to section 7434 was enacted prior to the creation of the Security Fund (see, majority opn, at 120). In fact, the word “payments” in the current section 7434 (a) is derived from the 1932 statute which provided that the court could authorize the Superintendent “to declare out of the funds remaining in [the Superintendent’s] hands after the payment of expenses one or more dividends” (L 1932, ch 191, adding former Insurance Law § 426 [emphasis supplied]).
Thus, neither the word payment nor dividend in section 7434, or for that matter, any part of article 74, was intended to refer expressly to the Security Fund — rendering any payment/ dividend distinction in article 74 meaningless for our purposes. *134 Indeed, the conclusion that because article 74 does not expressly address the Security Fund, the limitations on claims created by that article do not apply to payments made from the Fund, undermines the obvious attempt, by the Legislature in article 76, to adopt such limitations by specifically permitting recovery of only those claims allowable under article 74 (see, Insurance Law § 7602 [g]).
Alternatively, Royal asserts, and the majority accepts, that the claim for postliquidation interest is actually “allowed” within the meaning of Insurance Law § 7602 (g) and § 7603 (a) (1) because had sufficient funds existed in the liquidated estate to pay all claimants in full with interest, our common-law precedents would permit Royal to recover the interest (see, Matter of People [Norske Lloyd Ins. Co.], 249 NY 139, 147). This interpretation of “allowed claim” is flatly contradicted by our holding in Matter of Professional Ins. Co. (Jason — Superintendent of Ins.) (49 NY2d 716, affg for reasons stated 67 AD2d 850).
Noting that the Security Fund “is available only for ‘allowed claims,’ ” the Appellate Division in Jason refused to allow a creditor to recover a claim from the Security Fund that had been deferred under former article 16 (recodified as article 74) as untimely (id., 67 AD2d, at 850). This Court adopted the lower court’s analysis, including its rejection of the notion that an “allowed claim” is anything that possibly could be payable from the liquidated estate, were sufficient funds available (see, majority opn, at 120). In Jason, the deferred claim would have been recoverable from the liquidated estate after “all allowed claims, proofs of which were filed before such specified date, have been paid, in full with interest” (Insurance Law § 7432 [c]). Nevertheless, the Court held that payment of the deferred claim could not be obtained from the Security Fund. Thus, Royal’s alternative “allowed claim” argument fails, in that the insolvent insurer’s assets in this case are concededly insufficient to pay all estate claims in full (see, majority opn, at 119), and Jason dictates that claims must be actually, as opposed to hypothetically, allowed by the Liquidator to be carried over against the Security Fund.
The majority would distinguish Jason, arguing that “Royal’s application for postliquidation interest is not a separate claim but, rather, is an integral component of the claim which has already been determined to be an allowed claim” (majority opn, at 126). This argument is contradicted by the conceded fact that a claim for postliquidation interest here would not have been *135 allowable against the liquidated estate under Insurance Law § 7434 (b). It seems elementary and undeniable that a single claim might be allowed in part and rejected in part by the court supervising the liquidated estate. Indeed, that is precisely the purpose and effect of section 7434 (b), barring a claim for postliquidation interest irrespective of whether it is considered an integral component of any claim against the liquidated estate. Thus, the majority’s distinguishment of Jason really comes back to its essential argument, which we have already discussed, that disallowance of interest under section 7434 (b) somehow nonetheless is not also an article 74 disallowance for the purposes of sections 7603 (a) (1) and 7602 (g).
Moreover, the policy underlying the disallowance of postliquidation interest — i.e., protecting the other creditors of the insolvent insurer — is served by denying the claim for postliquidation interest from the Security Fund (see, People v American Loan & Trust Co., 172 NY 371, 379 [“Interest should not run in favor of one creditor at the expense of another, while the law, acting for all, is administering the assets”], remittitur amended 177 NY 467; see also, Bill Jacket, L 1940, ch 621). Contrary to the majority’s suggestion that there is no danger of prejudice enuring to other creditors when the payments are made from the Security Fund as opposed to the liquidated estate (see, majority opn, at 119), the Security Fund’s treatment of claims does impact the liquidated estate and, therefore, other creditors. First, as the Court’s adopted analysis in Jason provides:
“[Prejudice indeed arises, if petitioner’s deferred claim is admitted to participation in the security fund. There exists a potential for dilution of the timely filed claims, and because the security fund is built up with premiums from policyholders of all carriers writing the types of coverage specified * * * they will be burdened with additional premiums to replenish the fund earlier than contemplated by the statutory scheme, if deferred claims are allowed to participate” (Matter of Professional Ins. Co. [Jason — Superintendent of Ins.], supra, 67 AD2d, at 851 [citations omitted]).
Second, neither Royal, the courts below nor the majority provides a satisfying answer to the Superintendent’s argument that, were postliquidation interest payable from the Security Fund, the subrogation provisions of article 76 would give the *136 Security Fund a claim over against the insolvent insurer’s estate for that interest, in derogation of the express prohibition of section 7434 (b). The New York State Commissioner of Taxation and Finance, as custodian, of the Security Fund, is “entitled to a valid claim against an insurer which becomes insolvent or unable to meet its insurance obligations, or its liquidator * * * in an amount equal to the liabilities, including loss adjustment expenses relating to such liabilities, of the insurer paid from the fund less the net payments paid into the fund by such insurer” (see, Insurance Law § 7609 [a] [emphasis supplied]).
Thus, the Security Fund, if it pays postliquidation interest to Royal, will have a greater claim against the liquidated estate than Royal itself would have had, thereby increasing the estate’s over-all debt to the detriment of all other creditors sharing in the liquidated assets of the estate. Such a result clearly would contravene Insurance Law § 7434 (b), and the established principles underlying that statute (see, People v American Loan & Trust Co., supra, 172 NY, at 377-380).
The majority’s conclusion that this result is acceptable because the Security Fund is designed to give creditors more than they would have gotten from the liquidated estate (see, majority opn, at 127) does not address the fundamental problem that is created by the payment from the Security Fund of postliquidation interest, which is entirely disallowed under article 74 unless all creditors of the insolvent insurer receive it. The essential conundrum is that such payment will necessarily result in unequal treatment of all creditors in the administration of the liquidated estate and will excessively deplete the Security Fund beyond its intended purpose (see, Matter of Professional Ins. Co. [Jason — Superintendent of Ins.], supra).
Of course a claimant will ordinarily get more from the Security Fund than from the liquidated estate. But, so long as postliquidation interest is denied because of its disallowance under article 74, what a claimant receives from the Security Fund will not be at the expense of other creditors in the liquidated estate. The Security Fund’s subrogation rights in the liquidated estate will then not be any greater than that of the creditor who is paid from the Fund. Although the Security Fund’s claim will be offset by the net payments made by the insolvent insurer to the Fund, there is nothing in the record to support the majority’s apparent conclusion that this amount will counteract Royal’s collection of over $6,500,000 of postliq *137 nidation interest (see, majority opn, at 127-128). It would seem self-evident that Union’s contribution to the Security Fund could not possibly approach this amount. That there will inevitably be resultant unequal treatment of creditors of the insolvent insurer here if Royal is paid on its postliquidation interest claim is, thus, hardly “unfounded” (see, id., at 128).
Although the Legislature has since recognized that “the Security Fund is nqt an appropriate vehicle for financial guaranties or to insulate investors against investment risk” (see, Mem of St Exec Dept, 1989 McKinney’s Session Laws of NY, at 2057), and amended article 76 to provide that investment bonds are no longer protected by the Security Fund, the majority’s decision today sets a precedent that will impact all future claims, not only for postliquidation interest in a wide range of contexts, but any and all claims where article 74 restricts or disqualifies claimants for payments of dividends. As demonstrated, this expansion of the Security Fund’s obligations is to the potential detriment of all remaining creditors of an insolvent insurer’s liquidated estate.
In addition, I disagree that either the legislative history or policy behind section 7434 (b) supports Royal’s claim for postliquidation interest. As the majority explains, section 7434 (b) was enacted with the express purpose of overruling this Court’s decision in Matter of Consolidated Indent. & Ins. Co. (281 NY 680, affg 256 App Div 604, rearg denied 281 NY 830), where recovery had been permitted from the liquidated estate of postliquidation interest that had accrued while the Superintendent unsuccessfully litigated the claim. In Matter of Consolidated Indent. & Ins. Co., as the dividends of the other creditors had been paid, the Court thus found that awarding interest on the delayed claim was the equitable result (see, supra, 256 App Div, at 604). Nevertheless, upon the recommendation of the Department of Insurance, our decision in Matter of Consolidated Indent. & Ins. Co. was legislatively overruled “to remove any doubt about the liability for interest on dividends” (Mem of NY Ins Dept, Bill Jacket, L 1940, ch 621, at 3).
Far from limiting the application of section 7434 (see, majority opn, at 120), the legislative history surrounding its enactment supports the Superintendent’s construction here. Despite the recognized unfairness of the rule to the creditor whose claim is delayed, the bill was recommended because it was found that “it is to the advantage of all creditors of an insurance company that questionable claims be contested by the *138 liquidator” (Mem of NY County Lawyers’ Assn Comm on St Legislation, Bill Jacket, L 1940, ch 621, at 5; see also, Mem of NY Ins Dept, Bill Jacket, op. cit., at 3). The same policy consideration — preventing a chilling effect on the Superintendent’s decision to challenge claims and thus protect the Security Fund — applies in the instant case.
Finally, I disagree that Matter of People (Norske Lloyd Ins. Co.) (249 NY 139, supra) supports the payment of postliquidation interest by the Security Fund here (see, majority opn, at 118-119). In Norske Lloyd, the “fund” at issue was actually an asset of the liquidated estate that the Legislature had required to be set aside to benefit a specific class of claimants against the liquidated estate, i.e., American creditors. As to those creditors, therefore, interest would have been an “allowable claim” because the liquidated estate assets in question were sufficient to pay all allowed claims (i.e., claims of American creditors) with interest. Here, by contrast, Royal is not a favored creditor of the liquidated estate attempting to lay claim to an estate asset that has been earmarked for a distinct class of creditors and, concededly, there are insufficient assets in the liquidated estate to pay all creditors in full with interest. Moreover, Royal’s claim for interest was barred by Insurance Law § 7434 (b), enacted subsequent to the Norske decision.
The Security Fund is an alternate, supplementary remedy — an “extraordinary benefit” (majority opn, at 113) for the New York creditors of an insolvent insurer. Article 76 reflects the Legislature’s intent to protect New York creditors of insolvent insurers from most, but not all, loss, and, consistent with that purpose, it limits recovery to what is a cognizable claim under article 74. The Security Fund is not isolated from the liquidation proceeding, but instead is permitted to defend claims using any defense the insurer would have the right to assert (see, Insurance Law § 7610 [a]; 1969 Report of NY Ins Dept to Governor, “The Public Interest Now in Property and Liability Insurance Regulation,” at 61 [“The Fund, and not the policyholder, would then abide the results of the liquidation proceeding”]). The Superintendent’s decision to deny Royal’s claim for postliquidation interest reflects this carefully balanced interaction between articles 74 and 76 of the Insurance Law, and should be upheld.
III.
Turning next to Insurance Law § 7608 (c), I conclude that the Superintendent’s position that the “limit of liability” of an *139 investment bond is the face, or principal, amount stated in the bond, exclusive of interest and attorneys’ fees, also is a reasonable construction of the statute and, therefore, should be upheld.
First, despite arguments by Royal that reference to “surety bond” in section 7608 (c) was intended only to extend to claims arising out of corporate surety bonds protected by the Public Motor Vehicle Liability Security Fund and not bonds guaranteed by the Property/Casualty Insurance Security Fund, the statute unequivocally extends to payments from the “funds” (plural), and there are only two funds covered by article 76— the Public Motor Vehicle Liability Security Fund and the Property/Casualty Insurance Security Fund at issue here (see, Insurance Law § 7608 [c] [“No payment from the funds shall exceed the limit of liability provided for in the insurance policy or surety bond”] [emphasis supplied]). Thus, unavoidably, the restriction in the statute can only be read to include the surety bonds relevant to this appeal, payable out of the Security Fund. Certainly, at the very least, it cannot be said that the Superintendent was acting irrationally in interpreting the statute in this fashion.
To be sure, the phrase “limit of liability” more readily lends itself to common usage with respect to liability insurance policies (see, Dingle v Prudential Prop. & Cas. Ins. Co., 85 NY2d 657, 659-660 [discussing policy limit as the fixed face amount of the policy coverage, exclusive of interest]). Yet, as already noted, the statute unequivocally demonstrates that the limit of liability restriction modifies “security bond” as well as “insurance policy.” To give some meaningful application to this restriction as to security bonds, the Superintendent has, by analogizing to the facial coverage of insurance policies, imposed a similar, definite limit on investment bonds by interpreting “limit of liability” to be the principal amount of the bond — the only fixed amount reflected on the face of the bond. The majority’s rejection of this bright line rule in favor of calculating the limit by adding together every conceivable liability covered in the bond, on the other hand, will create uncertain results and uneven application of the limit of liability restraint to security bonds.
Furthermore, contrary to the argument that Royal advances, the Superintendent’s position is not internally inconsistent, and, thus, there is no basis for annulling it on that ground (see, Matter of Field Delivery Serv. [Roberts], 66 NY2d 516, 520, supra). The Superintendent has conceded, correctly, that *140 defense costs and preliquidation interest may be recoverable from the liquidated estate and, therefore, were not in excess of the upper limit imposed by Insurance Law § 7608 (c), from the Security Fund (see, Matter of Transit Cas. Co. [Digirol — Superintendent of Ins.], 79 NY2d 13, 18; Matter of Empire State Sur. Co., 214 NY 553, 563). This position does not conflict with the Superintendent’s judgment, under section 7608 (c), that recovery from the Fund should not be permitted in excess of the face amount of the bonds.
For example, preliquidation interest and attorneys’ fees may well be recoverable where there had been a partial payment on principal before insolvency, leaving an available residue below the liability cap for recovery of interest and attorneys’ fees. Section 7608 (c) is a monetary ceiling, and does not speak to the “type” of claim allowed. Thus, I disagree with the majority that the Superintendent’s acknowledgment that preliquidation interest and the cost of defense may qualify for Security Fund coverage “undercuts the logic and cogency of his argument that the limit of liability is strictly limited to the principal amount of the bond” (majority opn, at 122).
I conclude that the Superintendent’s determinations comport with the language and purpose of the statutes and are not internally inconsistent, and, therefore, merit deference by this Court. Accordingly, in all aspects, I would vote to reverse.
Judges Titone, Smith, Ciparick and Wesley concur with Judge Bellacosa; Chief Judge Kaye concurs in part and dissents in part in a separate opinion; Judge Levine dissents and votes to reverse in another opinion.
Judgment of Supreme Court and order of the Appellate Division brought up for review affirmed, with costs.

 As we will show infra, there is no conflict in the positions taken by the Superintendent in this proceeding.